UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TANIA CABRERA,<br>    Plaintiff,<br>v.<br>THE TOWN OF AMHERST,<br>DIEGO SHARON,<br>SARA BARBER-JUST,<br>MARTA GUEVARA, MICHAEL MORRIS<br>CELIA MAYSLES and JULIE WOYNER,<br>    Defendants | C.A. 3:24-cv-30031 |

**COMPLAINT AND JURY DEMAND**

**Parties**

1. Plaintiff Tania Cabrera is an individual who resides in Springfield, Hampden County, Massachusetts, and was employed as a school guidance counselor for the Amherst Regional Middle School.

2. Defendant Town of Amherst is a Hampshire County municipality that operates the Amherst Regional Public Schools, which includes the Amherst Regional Middle School, where Plaintiff was formerly employed.

3. Defendant Diego Sharon is an individual who resides in Amherst, Massachusetts, and was at all times relevant to this Complaint the Principal at the Amherst Regional Middle School.

4. Defendant Sara Barber-Just is an individual who resides in Amherst, Massachusetts, and who at all times relevant was and is employed by the Town of Amherst and operates the Amherst Public School's newspaper, *The Graphic*.

5. Defendant Marta Guevara is an individual who resides in Amherst, Massachusetts, and at all times relevant was and is employed by the Town of Amherst and acts as the Amherst Public Schools' Title IX coordinator.

6. Defendant Michael Morris is an individual who resides in Amherst, Massachusetts, and at all times relevant was employed by the Town of Amherst and was the Superintendent of the Amherst Regional Public Schools.

7. Defendant Celia Maysles is an individual who resides in Amherst, Massachusetts, and who at all times relevant was employed by the Amherst Regional Middle School.

8. Defendant Julie Woyner is an individual who resides in Amherst, Massachusetts, and who at all times relevant was employed by the Amherst Regional Middle School.

**Jurisdiction, Venue and Standing**

9. Plaintiff brings this action under Title VII of the Civil Rights Act, 42 U.S.C. § 1983 and the United States Constitution, along with ancillary state claims, giving this Court jurisdiction under 28 U.S.C. § 1331.

10. Plaintiff's claims arise out of the context of her employment by the Defendant, who is a public school in Hampshire County, Massachusetts.

11. Venue is proper under 28 U.S.C. § 1391, in that all of the defendants reside in Western Massachusetts, and the substantial part of the events or

omissions giving rise to the Plaintiff's claim occurred in Western Massachusetts.

**Factual Allegations**

12. In December of 2022, two guidance counselors, Delinda Dykes and Hector Santos (Plaintiff's father), attended a meeting at Amherst Regional Middle School, led by Defendants Maysles, Sharon and Guevara.

13. The topic of the meeting was sexual harassment, wherein Maysles, Sharon and Guevara presented sexual harassment against transgender students as a unique and imminent problem at the school.

14. During the meeting, Hector Santos and Delinda Dykes presented feedback that was critical of the data presented and the methods for addressing the problem, suggesting that sexual harassment of transgender students was not nearly the serious problem that Defendants suggested it was.

15. Dykes and Santos suggested that the Defendants' ideological positions on the matter, along with their data, were incorrect.

16. Defendants Maysles, Guevara and Sharon expressed their frustrations with Dykes and Santos.

17. Defendant Sharon went so far as to order Dykes to stop asking questions during the meeting.

18. As of December, 2022, all individually named Defendants were aware that Santos, Dykes and Plaintiff were professing Christians.

19. Roughly a month later, in January of 2023, Assistant Superintendent Doreen Cunningham sent an employee named Peter Vamosy a letter informing him of ARPS' intent to terminate his employment, which the district later followed through on.

20. Frustrated at Dykes and Santos, a group of teachers and staff, including Defendants Barber-Just, Maysles, Woyner, Guevara and Sharon sought to get them, along with Plaintiff, fired.

21. The aforementioned Defendants sought to get Santos, Dykes and Plaintiff fired because of their Christian beliefs.

22. It began with a rumor that Plaintiff, Dykes and Santos were engaging in "conversion therapy" in their roles as guidance counselors at the middle school, created upon information and belief by Defendant Woyner and repeated by Defendant Sharon and the other individually named Defendants.

23. On or about April 25, 2023, Defendant Michael Morris asked Dykes, Santos, and the Plaintiff to meet with him in his office for a department meeting.

24. Morris stated that there were rumors that guidance counselors at the middle school were practicing conversion therapy on a group of transgender students.

25. Santos raised the point that although there were five guidance counselors at the middle school, only the three professing Christians were called into his office.

26. Santos also asked for an investigation into the conversion therapy allegations, knowing that their names would be cleared.
27. Morris stated that there was no need for an investigation.
28. Neither Diego Sharon nor Marta Guevara initiated any investigations.
29. Morris and Doreen Cunningham, the director of Diversity and Inclusion in Amherst Regional Middle School, assured Plaintiff, Santos and Dykes that they did not believe the rumor and that they would obviously face no punishment.
30. Unhappy that Plaintiff, Dykes and Santos received no punishment, Defendant Barber-Just emailed Morris, Guevara and Sharon just two days later, on April 27, 2023, stating that she read an article about alleged transphobia at ARMS in the Hampshire Gazette.
31. In this same email, Barber-Just stated that her journalism students wished to interview counselors at the middle school.
32. Further, Barber-Just shared a social media post that was "reposted" by Santos, and suggested within the body of the email that Santos should lose his job. (Exhibit A)
33. The post was Christian in nature, showing what appeared to be Christ's hands protecting young children from rainbow paint.
34. Santos and Dykes were then placed on leave on May 8, 2023, for a Title IX investigation.

35. The next day, Barber-Just orchestrated a hit-piece to be published in the school newspaper, *The Graphic*. (Exhibit B)

36. The article, entitled "It's Life or Death: Failure to Protect Trans Kids at ARMS is a Systemic Problem," included several defamatory statements about Santos, Dykes and Plaintiff.

37. As to Plaintiff, the following defamatory statements were made, alleging that Plaintiff:

    a. "[M]isgendered trans kids";

    b. "[T]old staff that a trans student had reverted to using their legal name when they had not";

    c. "[D]id not report on an anti-LGBTQ harassment incident that was reported to her";

    d. "[T]old a trans male student who went to her for support that she sympathized with his parents"; and

    e. Engaged in conversion therapy.

38. Before Barber-Just published her article in *The Graphic*, Defendant Morris informed her that these were just rumors, that Santos and Dykes were under investigation and asked her not to publish it.

39. She published it anyway.

40. In the article, Barber-Just makes mention of the alleged connection between Santos, Dykes and Doreen Cunningham, and made a point to address that

Santos referred to Dykes and her husband, in a photo with Cunningham, as "siblings in faith," a commonly used phrase that Christians use.

41. The article makes mention of Santos and Dykes' practice of Christianity throughout.

42. Peter Vamosy, who had recently been terminated, used his child as an example of a purported victim of Santos and Dykes' transphobia.

43. On or about May 10, 2023, Plaintiff was told by Defendants Sharon and Morris that she would also be put on paid administrative leave.

44. Plaintiff was told her leave would be for her own safety because of the recent Newspaper articles and that she was ***not*** under investigation.

45. Plaintiff was not given anything in writing explaining why she was placed on leave.

46. On May 12, 2023, Defendant Morris took a leave of absence.

47. On May 30, 2023, Plaintiff received a letter stating that her contract of employment would not be renewed for the upcoming school year.

48. Plaintiff then filed a grievance with her union on or about June 23, 2023, stating that she was non-renewed without just cause and without an evaluation.

49. Three days later, in clear retaliation, Plaintiff received a letter from Defendant Town of Amherst that she was now under investigation for Title IX violations. (Exhibit C).

50. Defendant Sharon then put together a pretextual evaluation of Plaintiff on subject matter that he never discussed with her, yet happened to align with the false allegations in *The Graphic* article.

51. In the meantime, defendant Guevara was gathering witnesses to try to disparage Plaintiff, Dykes and Santos in their respective Title IX investigations.

52. Sharon's evaluation was also not mathematically accurate, portraying Plaintiff in a negative light.

53. The first allegation was admitted to; however Plaintiff not only self-reported the incident, she never "sympathized with the parent" of the transgender student, but rather tried to show empathy to the student and suggested that the student's father was likely having a hard time accepting it and to give the situation time.

54. In short, Plaintiff made the statement, but it was not an insult as was suggested in *The Graphic* and the Title IX notice.

55. The results of the Title IX investigation cleared Plaintiff of any Title IX violation.

56. During the investigation, Defendant Maysles told the investigator that at weekly Student Support Team meetings, Plaintiff "routinely misgendered students," yet could produce only one example, which Plaintiff denies.

57. Defendant Maysles' statements that Plaintiff routinely misgendered students is false.

58. Defendant Sharon also made statements that he heard the Plaintiff misgendering students at these meetings.

59. Defendant Sharon claimed to have addressed these situations with Plaintiff but provided no notes or any evidence whatsoever that these counseling sessions occurred.

60. Defendant Sharon could provide no examples of Plaintiff ever misgendering students.

61. Defendant Sharon's statements that Plaintiff misgendered students and that he discussed these with her are false.

62. In fact, Defendant Sharon was rarely at the SST meetings and never spoke to Plaintiff about any misgendering issue at a meeting.

63. Plaintiff attended roughly forty different staff meetings over the course of the 2022-2023 school year and was never once spoken to regarding "misgendering," simply because it did not occur.

## COUNT I
**(Religious Discrimination – 42 U.S.C. 2000e as to Town of Amherst and Diego Sharon)**

64. Plaintiff repeats and re-alleges paragraphs 1-62 of this Complaint.

65. Defendant Sharon prepared a negative evaluation of Plaintiff for the sole purpose of supporting a decision not to renew her contract with the Town.

66. Defendant Sharon fabricated the evaluation based on rumors that were false, as Defendant Sharon met with Plaintiff on only one occasion during the evaluation period.

67. Defendant Sharon's evaluation and false statements about Cabrera "misgendering students" led to Cabrera's non-renewal, which was an effective discharge of her employment.

68. The reason that the Town of Amherst and Sharon discharged Plaintiff was not based on merit but was based on her Christian beliefs and association with other Christian guidance counselors.

69. 42 U.S.C. 2000e makes it an unlawful practice for an employer to discharge an employee on the basis of their religion.

70. Cabrera was not found to have committed any Title IX violations, nor were any of the allegations of conversion therapy or misgendering ever substantiated, even by those who made the allegations.

71. Thus, there was no other reason for Cabrera's non-renewal, other than her religious affiliation.

## COUNT II
### (Retaliation – Title VII as to Town of Amherst)

72. Plaintiff repeats and re-alleges paragraphs 1-71 of this Complaint.

73. Plaintiff was engaged in a protected activity when she filed her grievance with her Teacher's Union.

74. Defendant then took the adverse action of placing Plaintiff under investigation for purported Title IX violations, which, even on the face of the allegations, were not in fact violations of Title IX.

75. Further, Defendants Morris and Sharon assured Plaintiff that she was not under investigation when she was placed on leave.

76. Defendant placed Plaintiff under investigation in an effort to bolster their decision not to renew her contract, in hopes that the investigation would expose some sort of wrongdoing by Plaintiff, which it did not.

77. The adverse action would not have occurred but for a retaliatory motive against Plaintiff for filing a grievance over her wrongfully being non-renewed.

## COUNT III
### (42 U.S.C. § 1983: Violation of Equal Protection - Fourteenth Amendment to the Unites States Constitution as to Town of Amherst, Diego Sharon, Michael Morris and Marta Guevara)

78. Plaintiff repeats and re-alleges paragraphs numbered 1 through 77.

79. At all times relevant, Defendants were acting under the color of state law.

80. Plaintiffs' right to Equal Protection under the laws is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

81. Defendants' policies, practices, and actions are unconstitutional abridgements of Plaintiffs' affirmative right to Equal Protection of the laws, are not facially neutral, and specifically target Plaintiffs' religious viewpoints and speech.

82. Defendants' policies, practices, and actions are unconstitutional because they treat "non-secular" speech and affiliation differently than they treat displays of "secular" speech and affiliation.

83. Defendants allow various secular speech and affiliation, such as pride flags and events and "Black Lives Matter" memorabilia to be posted throughout the schools.

84. At the same time, Hector Santos' repost of a Christian themed Facebook post landed himself, Dykes, and, by association, Plaintiff, under Title IX investigation.

85. *The Graphic* is the school's newspaper and thus the Town of Amherst, Morris, Sharon and Guevara could have prevented its publication of the false statements about Plaintiff, but they did not.

86. Depicting Plaintiff, Santos and Dykes as religious zealots who were out to convert and disrespect trans kids displays unequal treatment of similarly situated employees.

87. Further still, when rumors that "counselors" were performing "conversion therapy" at the school, only the three Christian counselors, including Plaintiff were called into the Superintendent's (Morris') office.

88. Additionally, Sharon and Guevara attempted to facilitate Title IX accusations and witnesses against Plaintiff (some of whom purportedly made the allegations but were not interviewed, or did not allege what the letter stated they did) because of her religious views, when there were no credible allegations that she actually violated Title IX.

89. Defendants' policies, practices, and actions are unconstitutional abridgements of Plaintiff's right to Equal Protection of the laws because

Defendants treat Plaintiffs differently from other similarly situated individuals and groups on the basis of Plaintiff's supposed religious viewpoint.

90. Defendants' policies, practices, and actions are not supported by a compelling governmental interest sufficient to justify their enactment or enforcement against Plaintiff.

91. Defendants' policies, practices, and actions are not the least restrictive means to accomplish any permissible government purpose sought to be served thereby.

92. Defendants' policies, practices, and actions do not serve a significant government interest.

93. Defendants' policies, practices, and actions do not leave open ample alternative channels of communication.

94. Defendants' policies, practices, and actions are irrational and unreasonable, and impose irrational and unjustifiable restrictions on constitutionally protected speech and practice of religion.

95. Defendants, in violation of the Equal Protection Clause, have caused Plaintiff to suffer undue and actual hardship and irreparable injury.

**COUNT V**
**(42 U.S.C. § 1983: Violation of the Establishment Clause**
**- First Amendment to the United States Constitution as to Town of Amherst, Diego Sharon, Michael Morris and Marta Guevara)**

96. Plaintiff repeats and re-alleges paragraphs numbered 1 through 95.

97. The Establishment Clause of the First Amendment to the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits the establishment of any religion, hostility towards religion, and excessive government entanglement with religion.

98. Defendants' policies, practices, and actions constitute a violation of the Establishment Clause because they are devoid of a secular purpose.

99. Defendants' policies, practices, and actions constitute a violation of the Establishment Clause because they are not neutral, but are invidious and hostile, towards religion.

100. Defendants' policies, practices, and actions discriminate against Plaintiff and treat her less favorably than others who display "secular" viewpoints and opinions openly in the workplace.

101. Defendants' policies, practices, and actions constitute a violation of the Establishment Clause because they create an excessive government entanglement with religion.

## COUNT VI
**(Defamation as to Town of Amherst, Woynar, Sharon, Barber-Just and Maysles)**

102. Plaintiff repeats and re-alleges paragraphs numbered 1 through 101 of this Complaint.

103. The statements made by Barber-Just in *The Graphic* article (published in the school's newspaper), the statements made by Sharon and Maysles regarding Plaintiff's "misgendering" and the statements made by Woynar

regarding Plaintiff's being engaged in "conversion therapy" are not only false, but directly affected Plaintiff's reputation, personally and professionally.

104. Plaintiff had a difficult time finding work after her contract was non-renewed, as her name appeared connected to these events on any "Google" search.

105. The statements made by the Defendants are such that any reasonable member of the community would form a lower opinion of Plaintiff as a result, and would discredit the Plaintiff in the minds of any considerable respectful class of the community.

106. Defendants' false statements significantly prejudice Plaintiff's profession, as they are statements that impugn her character.

WHEREFORE, Plaintiff demands judgment against the Defendants, including money damages, punitive damages where applicable, plus interest, costs and attorney fees, along with any other relief that this Court deems proper.

**Plaintiff demands a Jury Trial on all claims.**

    Respectfully submitted:

    /s/ Ryan P. McLane, Esq.
    Ryan P. McLane, Esq.
    McLane & McLane, LLC
    269 South Westfield Street
    Feeding Hills, MA 01030
    Tel: (413) 789-7771
    Email: ryan@mclanelaw.com