UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TANIA CABRERA,<br>    Plaintiff,<br>v.<br>AMHERST-PELHAM REGIONAL<br>SCHOOL DISTRICT,<br>DIEGO SHARON,<br>SARA BARBER-JUST,<br>MARTA GUEVARA, MICHAEL MORRIS<br>CELIA MAYSLES and JULIE WOYNER,<br>Individually and in their capacities as<br>Employees of the<br>    Defendants | C.A. 3:24-cv-30031KAR |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

**Parties**

1. Plaintiff Tania Cabrera is an individual who resides in Springfield, Hampden County, Massachusetts, and was employed as a school guidance counselor for the Amherst Regional Middle School.

2. Defendant Amherst Pelham Regional School District includes the Amherst Regional Middle School, where Plaintiff was formerly employed.

3. Defendant Diego Sharon is an individual who resides in Amherst, Massachusetts, and was at all times relevant to this Complaint the Principal at the Amherst Regional Middle School.

4. Defendant Sara Barber-Just is an individual who resides in Amherst, Massachusetts, and who at all times relevant was and is employed by Amherst Pelham Regional School District and operates the Amherst Public

1

School's newspaper, *The Graphic*.

5. Defendant Marta Guevara is an individual who resides in Amherst, Massachusetts, and at all times relevant was and is employed by Amherst Pelham Regional School District and acts as the Amherst Public Schools' Title IX coordinator.

6. Defendant Michael Morris is an individual who resides in Amherst, Massachusetts, and at all times relevant was employed by Amherst Pelham Regional School District and was the Superintendent of the Amherst Regional Public Schools.

7. Defendant Celia Maysles is an individual who resides in Amherst, Massachusetts, and who at all times relevant was employed by the Amherst Regional Middle School.

8. Defendant Julie Woyner is an individual who resides in Amherst, Massachusetts, and who at all times relevant was employed by the Amherst Regional Middle School.

**Jurisdiction, Venue and Standing**

9. Plaintiff brings this action under Title VII of the Civil Rights Act, 42 U.S.C. § 1983 and the United States Constitution, along with ancillary state claims, giving this Court jurisdiction under 28 U.S.C. § 1331.

10. Plaintiff's claims arise out of the context of her employment by the Defendant, who is a public school in Hampshire County, Massachusetts.

11. Venue is proper under 28 U.S.C. § 1391, in that all of the defendants reside

in Western Massachusetts, and the substantial part of the events or omissions giving rise to the Plaintiff's claim occurred in Western Massachusetts.

**Factual Allegations**

12. In December of 2022, two guidance counselors, Delinda Dykes and Hector Santos (Plaintiff's father), attended a meeting at Amherst Regional Middle School ("ARMS"), led by Defendants Maysles, Sharon and Guevara.
13. The topic of the meeting was sexual harassment, wherein Defendants Maysles, Sharon and Guevara presented sexual harassment against transgender students as a unique and imminent problem at the school.
14. During the meeting, Hector Santos and Delinda Dykes presented feedback that was critical of the data presented and the methods for addressing the problem, suggesting that sexual harassment of transgender students was not nearly the serious problem that Defendants suggested it was.
15. Dykes and Santos suggested that the Defendants' ideological positions on the matter, along with their data, were incorrect.
16. Defendants Maysles, Guevara and Sharon expressed their frustrations with Dykes and Santos.
17. Defendant Sharon went so far as to order Dykes to stop asking questions during the meeting.
18. As of December 2022, all individually named Defendants were aware that Santos, Dykes and Plaintiff were professing Christians.

3

19. Frustrated that Dykes and Santos, a group of teachers and staff, including Defendants Barber-Just, Maysles, Woyner, Guevara and Sharon sought to get them, along with Plaintiff, fired.

20. The aforementioned Defendants sought to get Santos, Dykes and Plaintiff fired because of their Christian beliefs.

21. A rumor was spread that Plaintiff, Dykes and Santos were engaging in "conversion therapy" in their roles as guidance counselors at ARMS, created upon information and belief by Defendants Woyner and Maysles, and repeated by Defendant Sharon and the other individually named Defendants.

22. On or about April 25, 2023, Defendant Michael Morris asked Dykes, Santos, and the Plaintiff to meet with him in his office for a department meeting.

23. Defendant Morris stated that there were rumors that guidance counselors at the middle school were practicing conversion therapy on a group of transgender students.

24. Santos raised the point that although there were five guidance counselors at the middle school, only the three professing Christians were called into his office.

25. Santos also asked for an investigation into the conversion therapy allegations, knowing that their names would be cleared.

26. Defendant Morris stated that there was no need for an investigation.

27. Neither Defendant Sharon nor Defendant Guevara initiated any investigations.

28. Defendant Morris and Doreen Cunningham, the director of Diversity and Inclusion in Amherst Regional Middle School, assured Plaintiff, Santos and Dykes that they did not believe the rumor and that the counselors, including Plaintiff, would obviously face no punishment.

29. Unhappy that Plaintiff, Dykes and Santos received no punishment, Defendant Barber-Just emailed Defendants Morris, Guevara and Sharon just two days later, on April 27, 2023, stating that she read an article about alleged transphobia at ARMS in the *Hampshire Gazette*.

30. In this same email, Defendant Barber-Just stated that her journalism students wished to interview counselors at the middle school.

31. Further, Defendant Barber-Just shared a social media post that was "reposted" by Santos, and suggested within the body of the email that Santos should lose his job. (Exhibit A)

32. The post was Christian in nature, showing what appeared to be Christ's hands protecting young children from rainbow paint.

33. Santos and Dykes were then placed on leave on May 8, 2023, for a Title IX investigation.

34. The next day, Defendant Barber-Just orchestrated a hit-piece to be published in the school newspaper, *The Graphic*. (Exhibit B)

35. The article, entitled "It's Life or Death: Failure to Protect Trans Kids at ARMS is a Systemic Problem," included several defamatory statements about Santos, Dykes and Plaintiff by name.

36. As to Plaintiff, the following defamatory statements were made, alleging that Plaintiff:

    a. "[M]isgendered trans kids";

    b. "[T]old staff that a trans student had reverted to using their legal name when they had not";

    c. "[D]id not report on an anti-LGBTQ harassment incident that was reported to her";

    d. "[T]old a trans male student who went to her for support that she sympathized with his parents"; and

    e. Engaged in conversion therapy.

37. Before Defendant Barber-Just published her article in *The Graphic*, Defendant Morris informed her that these were just rumors, that Santos and Dykes were under investigation and asked her not to publish it.

38. Defendant Barber-Just published it anyway.

39. In the article, Defendant Barber-Just makes mention of the alleged connection between Santos, Dykes and Doreen Cunningham, and made a point to address that Santos referred to Dykes and her husband, in a photo with Cunningham, as "siblings in faith", a commonly used phrase that Christians use.

40. The article makes mention of Santos and Dykes' practice of Christianity throughout.

41. In January of 2023, acting as Assistant Superintendent, Doreen

Cunningham sent an employee named Peter Vamosy a letter informing him of ARPS' intent to terminate his employment, which the district later followed through on.

42. Peter Vamosy, who had recently been terminated, used his child as an example of a purported victim of Santos and Dykes' transphobia.

43. On or about May 10, 2023, Plaintiff was told by Defendants Sharon and Morris that she would also be put on paid administrative leave.

44. Plaintiff was told her leave would be for her own safety because of the recent newspaper articles and that she was *not* under investigation.

45. Plaintiff was not given anything in writing explaining why she was placed on leave.

46. On May 12, 2023, Defendant Morris took a leave of absence.

47. On May 30, 2023, Plaintiff received a letter stating that her contract of employment would not be renewed for the upcoming school year.

48. Plaintiff then filed a grievance with her union on or about June 23, 2023, stating that she was non-renewed without just cause and without an evaluation.

49. Three days later, in clear retaliation, Plaintiff received a letter from Defendant Town of Amherst that she was now under investigation for Title IX violations. (Exhibit C).

50. Defendant Sharon then put together a pretextual evaluation of Plaintiff on a subject matter that he never discussed with her yet happened to align with

the false allegations in *The Graphic* article.

51. Defendant Sharon's evaluation was also not accurate (meaning, the number scores he gave Plaintiff in each category did not support the overall score she received), portraying Plaintiff in a negative light and including unfounded allegations about misgendering students.

52. In the meantime, Defendant Guevara was gathering witnesses to try to disparage Plaintiff, Dykes and Santos in their respective Title IX investigations.

53. Plaintiff's admitted that she said, "You used to be your father's little girl"; however, not only did Plaintiff self-report the incident, she never "sympathized with the parent" of the transgender student but rather tried to show empathy to the student and suggested that the student's father was likely having a hard time accepting the student's being transgender and to give the situation time.

54. In short, Plaintiff said "you used to be your father's little girl," but it was not an insult as was suggested in *The Graphic* and the Title IX notice.

55. The results of the Title IX investigation cleared Plaintiff of any Title IX violation.

56. During the investigation, Defendant Maysles told the investigator that at weekly Student Support Team ("SST") meetings, Plaintiff "routinely misgendered students," yet could produce only one example, which Plaintiff denies.

8

57. Defendant Maysles' statements that Plaintiff routinely misgendered students is false.

58. Defendant Sharon also made statements that he heard the Plaintiff misgendering students at these meetings.

59. Defendant Sharon claimed to have addressed these situations with Plaintiff but provided no notes or any evidence whatsoever that these counseling sessions occurred.

60. Defendant Sharon could provide no examples of Plaintiff ever misgendering students.

61. Defendant Sharon's statements that Plaintiff misgendered students and that he discussed these with her are false.

62. In fact, Defendant Sharon was rarely at the SST meetings and never spoke to Plaintiff about any misgendering issue at a meeting.

63. Plaintiff attended roughly forty different staff meetings over the course of the 2022-2023 school year and was never once spoken to regarding "misgendering", simply because it did not occur.

**COUNT I**
**(Religious Discrimination – 42 U.S.C. 2000e as to Amherst-Pelham Regional School District)**

64. Plaintiff repeats and re-alleges paragraphs 1-63 of this Complaint.

65. Defendant Sharon prepared a negative evaluation of Plaintiff for the sole purpose of supporting a decision not to renew her contract with the Town.

66. Defendant Sharon fabricated the evaluation based on rumors that were false, as Defendant Sharon met with Plaintiff on only one occasion during the evaluation period.

67. Defendant Sharon's evaluation and false statements about Plaintiff's "misgendering students" led to her non-renewal, which was an effective discharge of her employment.

68. The reason that Defendants Town of Amherst and Sharon discharged Plaintiff was not based on merit but was based on her Christian beliefs and association with other Christian guidance counselors.

69. The discharge was, more specifically, due to assumptions and stereotypes about Plaintiff's Christian beliefs, namely that she did not or could not appropriately support her LGBTQ students as a guidance counselor, despite the claims against her being unsubstantiated.

70. 42 U.S.C. 2000e makes it an unlawful practice for an employer to discharge an employee on the basis of their religion.

71. Plaintiff was not found to have committed any Title IX violations, nor were any of the allegations of conversion therapy or misgendering ever substantiated, even by those who made the allegations.

72. Even if Plaintiff did "misgender" students, she never did so intentionally.

73. Misgendering students was not uncommon and was discussed at the staff meetings.

74. Other staff and guidance counselors misgendered students but were never

punished for their actions.

75. By imposing harsher penalties on Plaintiff than her coworkers because of her Christian beliefs, ARMS engaged in religious discrimination.

76. Thus, there was no other reason for Plaintiff's non-renewal, other than her religious affiliation.

## COUNT II
### (Retaliation – Title VII as to Amherst Pelham Regional School District and Diego Sharon)

77. Plaintiff repeats and re-alleges paragraphs 1-76 of this Complaint.

78. Plaintiff was engaged in a protected activity when she filed her grievance with her Teacher's Union.

79. Defendant Sharon then took the adverse action of placing Plaintiff under investigation for purported Title IX violations, which, even on the face of the allegations, were not in fact violations of Title IX.

80. Further, Defendants Morris and Sharon assured Plaintiff that she was not under investigation when she was placed on leave.

81. Defendants Morris and Sharon placed Plaintiff under investigation in an effort to bolster their decision not to renew her contract, in hopes that the investigation would expose some sort of wrongdoing by Plaintiff, which it did not.

82. The adverse action would not have occurred but for a retaliatory motive against Plaintiff for filing a grievance over her wrongfully being non-renewed.

# COUNT III
## (42 U.S.C. § 1983: Violation of Equal Protection - Fourteenth Amendment to the Unites States Constitution as to Amherst-Pelham Regional School District, Diego Sharon, Michael Morris and Marta Guevara)

83. Plaintiff repeats and re-alleges paragraphs numbered 1 through 82.

84. At all times relevant, Defendants were acting under the color of state law.

85. Plaintiffs' right to Equal Protection under the laws is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

86. Defendants' policies, practices, and actions are unconstitutional abridgements of Plaintiffs' affirmative right to Equal Protection of the laws, are not facially neutral, and specifically target Plaintiffs' religious viewpoints and speech.

87. Defendants' policies, practices, and actions are unconstitutional because they treat "non-secular" speech and affiliation differently than they treat displays of "secular" speech and affiliation.

88. Defendants allow various secular speech and affiliation, such as pride flags and events and "Black Lives Matter" memorabilia to be posted throughout the schools, including in the classroom of Defendant Barber-Just.

89. Further, the guidance counselors and other staff who attended meetings with Plaintiff, including the individual Defendants who do not espouse the same purported views as Plaintiff, misgendered students without receiving the same punishment as the Plaintiff.

90. At the same time, Hector Santos' repost of a Christian themed Facebook post landed himself, Dykes, and, by association, Plaintiff, under Title IX investigation.

91. *The Graphic* is the school district's newspaper and thus Defendants Town of Amherst, Morris, Sharon and Guevara could have prevented its publication of the false statements about Plaintiff, but they did not.

92. Depicting Plaintiff, Santos and Dykes as religious zealots who were out to convert and disrespect trans kids displays unequal treatment of similarly situated employees.

93. Further still, when rumors that "counselors" were performing "conversion therapy" at the school, only the three Christian counselors, including Plaintiff were called into the Superintendent's (Defendant Morris') office.

94. Additionally, Defendants Sharon and Guevara attempted to facilitate Title IX accusations and witnesses against Plaintiff (some of whom purportedly made the allegations but were not interviewed or did not allege what the letter stated they did) because of her religious views, when there were no credible allegations that she actually violated Title IX.

95. Defendants' policies, practices, and actions are unconstitutional abridgements of Plaintiff's right to Equal Protection of the laws because Defendants treated Plaintiff differently from other similarly situated individuals and groups on the basis of Plaintiff's supposed religious viewpoint on transgender students.

96. Defendants' policies, practices, and actions are not supported by a compelling

governmental interest sufficient to justify their enactment or enforcement against Plaintiff.

97. Defendants' policies, practices, and actions are not the least restrictive means to accomplish any permissible government purpose sought to be served thereby.

98. Defendants' policies, practices, and actions do not serve a significant government interest.

99. Defendants' policies, practices, and actions do not leave open ample alternative channels of communication.

100. Defendants' policies, practices, and actions are irrational and unreasonable, and impose irrational and unjustifiable restrictions on constitutionally protected speech and practice of religion.

101. Defendants, in violation of the Equal Protection Clause, have caused Plaintiff to suffer undue and actual hardship and irreparable injury.

## COUNT IV
### (Defamation as to Woynar, Sharon, Barber-Just and Maysles)

102. Plaintiff repeats and re-alleges paragraphs numbered 1 through 101 of this Complaint.

103. The statements made by Defendant Barber-Just in *The Graphic* article (published in the school regions' newspaper), the statements made by Defendants Sharon and Maysles regarding Plaintiff's "misgendering" and the statements made by Defendants Woynar and Maysles regarding Plaintiff's being engaged in "conversion therapy are not only false, but

14

directly affected Plaintiff's reputation, personally and professionally.

104. Additionally, the Defendants were at best negligent in their creating and publishing of the statements against Plaintiff.

105. Plaintiff had a difficult time finding work after her contract was non-renewed, as her name appeared connected to these events on any "Google" search.

106. The statements made by the Defendants are such that any reasonable member of the community would form a lower opinion of Plaintiff as a result and would discredit the Plaintiff in the minds of any considerable respectful class of the community.

107. Defendants' false statements significantly prejudice Plaintiff's profession, as they are statements that impugn her character.

## COUNT V
**(42 U.S.C. § 1983: Violation of Free Exercise Clause - First Amendment to the Unites States Constitution as to Amherst-Pelham Regional School District, Diego Sharon, Michael Morris and Marta Guevara)**

108. Plaintiff repeats and re-alleges paragraphs numbered 1 through 107.

109. At all times relevant, Defendants were acting under the color of state law.

110. Plaintiffs' right to Free Exercise is protected by First Amendment to the United States Constitution.

111. Defendants' policies, practices, and actions are unconstitutional abridgements of Plaintiffs' affirmative right to Free Exercise, are not facially neutral, and specifically target Plaintiffs' religious views.

112. Defendants' policies, practices, and actions are unconstitutional because they treat "non-secular" views and affiliation differently than they treat displays of "secular" views and affiliation.

113. Defendants' policies, practices, and actions are unconstitutional abridgements of Plaintiff's right to Free Exercise because Defendants treat Plaintiff differently from other similarly situated individuals (the same as referenced in Count III) and groups on the basis of Plaintiff's supposed religious viewpoint.

114. Defendants' policies, practices, and actions are not supported by a compelling governmental interest sufficient to justify their enactment or enforcement against Plaintiff.

115. Defendants' policies, practices, and actions are not the least restrictive means to accomplish any permissible government purpose sought to be served thereby.

116. Defendants' policies, practices, and actions do not serve a significant government interest.

117. Thus, paragraphs 83-101, as incorporated into this Free Exercise claim, establish that the Defendants treated religious employees (including Plaintiff) worse than similarly situated non-religious employees because of assumptions made about her religious beliefs.

118. Further, there was no applicable "misgendering policy" at Amherst-Pelham Regional School District, and therefore any application of the so-

called policy was not generally applicable, since it was not applied to all employees.

119. Thus, Defendants applied stricter policies to those employees that it deemed to have certain religious beliefs that Defendants did not approve of and less strict policies to those employees who did not adhere to any specific religious belief.

120. Further, enforcement against Plaintiff, Hector Santos and Delinda Dykes demonstrates religious hostility by the Defendants.

121. Defendants' policies, practices, and actions are irrational and unreasonable, and impose irrational and unjustifiable restrictions on constitutionally protected practice of religion.

122. Defendants, in violation of the Free Exercise Clause, have caused Plaintiff to suffer undue and actual hardship and irreparable injury.

WHEREFORE, Plaintiff demands judgment against the Defendants, including money damages, punitive damages where applicable, plus interest, costs and attorney fees, along with any other relief that this Court deems proper.

**Plaintiff demands a Jury Trial on all claims.**

Respectfully submitted:

/s/ Ryan P. McLane, Esq.
Ryan P. McLane, Esq.
McLane & McLane, LLC
269 South Westfield St
Feeding Hills, MA 01030
Tel: (413) 789-7771
Email: ryan@mclanelaw.com
